## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RITA D. ROBINSON,

       Plaintiff,

v.                            No. CIV 02-644 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

       Defendant.

### MEMORANDUM OPINION AND ORDER

      Plaintiff Rita D. Robinson ("Robinson") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Robinson was not eligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). Robinson moves this Court for an order remanding or reversing this matter. [Doc. 8.]

      Robinson was born on December 10, 1956 and was 44 years old when the administrative hearing was held. She has a high school education and three years of college course work relating to a drafting program, during which she attained A's and B's. [Tr. at 257-58.] She previously held several part-time work study positions with the University of New Mexico Valencia Campus in Los Lunas. From March to May 1998, she catalogued books at the library; from August to December 1997, she worked in word processing in the Dean's Office; and from August 1995 to August 1997,

-1-

she worked in word processing in the Academic Office.  [Tr. at 117, 248.]  She has never been married, has no children, and lived alone at the time of the hearing. [Tr. at 50, 248.] From 1998 until the date of the administrative hearing, she received General Assistance from the State of New Mexico.  She lived on HUD assisted housing.  [Tr. at 247, 248.]

On March 27, 2000, Robinson applied for social security benefits, alleging an onset date of June 1, 1998, due to Bipolar Disorder II and post-traumatic stress disorder ("PTSD"), type II Diabetes, high blood pressure, and chronic facial pain. [Tr. 50-52, 66, 81, 226.] Administrative Law Judge Gary Vanderhoof held a hearing on May 30, 2001, at which Robinson was represented by counsel.  [Tr. at 243.]  In a decision, dated June 29, 2001, Judge Vanderhoof found that Robinson was not eligible for benefits.  The ALJ specifically determined that Robinson had the residual functional capacity ("RFC") to perform unskilled, routine work activities at all levels of exertion that did not require working with the public or significant contacts with co-workers and that she could return to her past relevant job.  [Tr. at 20-21.]  Robinson challenged the ALJ's decision to the Appeals Council which denied her request for review on April 5, 2002.  [Tr. at 8.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

----

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Here, after reviewing Robinson's medical records, symptoms and complaints, Judge Vanderhoof rejected Robinson's claim for benefits at step four, finding that Robinson could return

to her past relevant work. [Tr. at 21.] In reaching this decision, the ALJ made the following findings: (1) Robinson had not engaged in any substantial gainful activity during the period under review; (2) Robinson had impairments of Diabetes Mellitus, Bipolar Disorder and PTSD; (3) the impairments were not so severe as to meet or medically equal one of the listed impairments; (4) Robinson's allegations regarding her symptoms and restrictions were not totally credible; (5) she retained a RFC that supported unskilled, routine work activities at all levels of exertion provided she did not work with the public or have significant contacts with co-workers; (6) vocational expert testimony established that Robinson could return to her past relevant job as a data entry clerk; and (7) Robinson was not disabled during the time period at issue. [Tr. at 18-22.]

## Summary of Robinson's Employment and Medical History

On her disability application forms, Robinson wrote that she had held many jobs from 1976 to 1995, sometimes for no more than a month or two because of her emotional instability, illnesses and depression. She stated that she was unable to concentrate or deal with the public and co-workers or supervisors. [Tr. at 81.] She had to stop working on June 1, 1998 because she was unable to control her emotions and felt she could be a danger to others due to her temper. [Id.]

Robinson saw a number of therapists related to her depression from 1971 through 1987, until she was placed on Lithium for her bi-polar disorder. [Tr. at 83.] She asserts that she has struggled off and on for most of her life with depression, periods of manic euphoria, self-destructive behaviors and suicidal thoughts. For reasons that she does not understand, she has been able to hold a job and function with "some semblance of normalcy" during certain periods. However, in the last 5 years, she became progressively worse. [Tr. at 88.] She is on Paxil for depression and panic attacks and Depakote for depression/Bipolar Disorder. [Tr. at 90.]

On August 30, 2000, Robinson's roommate, Peggy Morgan, filled out a third party daily activities questionnaire. [Tr. at 110-13.] Ms. Morgan described herself as Robinson's only close friend. According to Ms. Morgan, Robinson slept most of the day, had few friends, liked to read or watch TV and had problems being in public or around crowds of people. She did not work because she could not be in an uncontrolled environment. Ms. Morgan paid the bills for Robinson, did the household chores and cooking and reported that Robinson needed reminders to bathe and attend to personal needs. Ms. Morgan believed that Robinson suffered from acute insomnia and was fearful, depressed and withdrawn. [Tr. at 113.]

Robinson's medical records begin in April 1998. From April 1998 through August 2000, Robinson received counseling from Valencia Counseling Services. However, those records are not part of the administrative record. Instead, the records from Valencia Counseling Services primarily consist of medical management notes made by psychiatrist, Dr. George Baca. [Tr. at 160-197.] The initial assessment form, dated April 22, 1998 is difficult to read but indicates that Robinson's presenting problem related to numerous deaths in her family. Her level of depression and anxiety was "high." [Tr. at 197.] She had a history of suicidal thoughts and current thoughts of suicide. [Tr. at 198.] She had a past history of physical and/or sexual abuse by her father. [Tr. at 205.] Her diagnoses were Bipolar Disorder, single episode, depression, Diabetes, asthma, migraines, high blood pressure. She was assigned a GAF of 45. [Tr. at 199.]

On April 29, 1998, Dr. Baca, saw Robinson for medical management. The record notes that she was on lithium in the past but it did not help. She reported problems with depression, feelings of disconnection to the world, suicidal thinking, low self perception, crying spells, irritability and anger spells for no apparent reason. She gave an unclear description of possible manic episodes,

although 2 incidents were related to the death of her brother and mother.  Robinson reported that she smoked one-half package of cigarettes per day and 2 to 3 packs a day for the last 13 years.  She had not used drugs in the past four years but she had used marijuana from ages 13-25, as well as methamphetamines and heroin.  [Tr. at 194.]  Dr. Baca assigned a GAF of 55.  [Tr. at 195.]  She started Paxil on this date.  [Tr. at 193.]

On May 6, 1998, Robinson was seen at a medical clinic for depression.  She was also concerned about a possible sinus infection or cold.  She did not feel well.  The record notes that she had fallen down and hit her face.  [Tr. at 149.]

On May 13, 1998, Robinson saw Dr. Baca and reported no real problems with the Paxil.  She noted some positive changes in the beginning.  Robinson stated that she would not be able to graduate as planned this month but that she should graduate in the summer.  [Tr. at 192.]

On May 20, 1998, Robinson was seen for her diabetes and a virus.  The medical record notes she was diabetic since 1986.  She was out of her diabetes medications and given samples.  Her diet was discussed with her, and she stated she would start monitoring her blood sugar and keeping a food diary.  [Tr. at 147.]

In June, August, September, October and November 1998, Robinson was seen for nasal and chest congestion, or a sinus infection.  The medical records reflect that she is a smoker and diabetic.  [Tr. at 139, 140, 141, 144, 146.]  She was given samples for her diabetes medications at some of these appointments.

On June 12, 1998, Robinson saw Dr. Baca about her medications.  She reported a partial response to the Paxil and definite improvement in some areas, including irritability.  Robinson was set up for counseling and was seeking vocational rehabilitative assistance and SSI benefits.  The Paxil

was increased.  [Tr. at 191.]  A June 16, 1998 record indicates that Robinson hoped to return to college in the Fall.  [Tr. at 190.]

On June 23, 1998, Dr. Baca wrote a letter on behalf of Robinson to New Mexico Human Services, Income Support Division ("ISD").  Dr. Baca stated that Robinson was "in trial" with medication and that her prognosis was not yet clear.  Dr. Baca opined that Robinson could not work then and that he expected the current level of disability to last at least 3 months.  [Tr. at 189.]

On July 10, 1998, Robinson was doing better on the increased dose of Paxil .  [Tr. at 188.] On August 11, 1998, Robinson reported that she was doing worse, and had increased stress at home due to an aunt dying of cancer.  She noted increased symptoms of irritability and difficulty dealing with stress.  She agreed to another increase in the Paxil to 40 mg.  [Tr. at 187.]  On September 1, Robinson was again doing better.  Her aunt had died recently.  Robinson was having difficulties with other relatives, and the record also notes she had a new "bf" which may mean boyfriend.  [Tr. at 186.]

It appears that on September 8, 1998, Dr. Baca made a note that he was going to send another letter to ISD on behalf of Robinson.  On October 6, Robinson was a no-show, but Baca wrote – "letter sent."  [Tr. at 184.]  On October 16, 1998, Robinson reported to Dr. Baca that she was not doing well.  She was getting over the flu but having continued trouble with her family regarding an inheritance.  She was still on 40 mg of Paxil.  [Tr. at 183.]  On November 20, Robinson reported that she was doing all right but stressed with the family situation.  The record notes that someone was thinking about having a competency hearing as Robinson's family claimed she "can't handle money (inheritance)."  [Tr. at 181.]  Robinson was having sleep problems.  On December 18, Robinson was still having problems with sleep but the family stress was improving.  She agreed to a trial of Trazodone for her sleep issues.  [Tr. at 180.]

On January 5, 1999, Dr. Yamamoto saw Robinson for complaints of right side facial pain. The record notes that she had had a dental appointment but the dentist did not feel it was a dental problem. [Tr. at 138.] Dr. Yamamoto concluded "possible trigeminal neuralgia" and referred her to UNM neurology. [Tr. at 138.]

On January 19, 1999, Dr. Baca reported Robinson was a no show. [Tr. at 179.]

On March 2, 1999, Robinson was seen at the University Hospital in Los Lunas for right facial pain. [Tr. at 122.] She was to get an MRI and prescribed Tegretol.

On March 15, 1999, Robinson saw Dr. Baca. She was doing all right on the Paxil which continued to be helpful. She reported having problems for two months with facial pain and numbness. She never filled the Trazodone prescription but was sleeping all right. [Tr. at 178.] On April 13, 1999, she was a no show for her appointment with Dr. Baca. [Tr. at 177.] On April 28, she reported doing well and that she had a court date soon regarding the inheritance. After the inheritance issues were resolved, she planned to move to Colorado, perhaps in the summer. She continued with the Paxil. [Tr. at 176.]

In a May 21 letter to ISD, Dr. Baca wrote that Robinson continued for medication management related to Bipolar II Disorder, which was a major mental illness. She was unable to work for at least another 3 months. [Tr. at 175.] On May 28, she was a no show, or may have showed up late to the appointment. She was doing well overall and awaiting her court date. [Tr. at 174.] On June 21, 1999, she was a no show. [Tr. at 173.]

On July 1, 1999, Robinson complained to Dr. Yamamoto of a continued sinus headache and pressure and fatigue. Her blood sugar was over 400 recently. She had not taken her diabetic

medications for months and was not checking her blood sugar.  She weighed 214 pounds.  Dr. Yamamoto reviewed her diet and potential diabetic complications.  [Tr. at 135.]

On August 4, 1999, Robinson requested a refill of Paxil from Dr. Yamamoto.  She had been out of the medication for a month and was now feeling depressed.  She had not been monitoring her blood sugar or taking her diabetic medications on a regular basis.  She stated that she intended to modify her diet.  [Tr. at 133.]  On August 16, 1999, Robinson visited the Emergency Room at University Hospital.  She complained of a headache for 2 days that had worsened.  She had had headaches for six months at that point.  [Tr. at 125.]

On September 21, 1999, Robinson saw Dr. Baca for the first time in a number of months.  She had taken herself off the Paxil for the last three months but was not doing as well with respect to her moods.  She started the Paxil again.  [Tr. at 172.]

On October 15, 1999, Robinson had a MRI related to complaints of right facial pain.  The results showed some abnormalities but were generally normal.  [Tr. at 120.]  For example, there were about 5-6 small foci of abnormal signal intensity in Robinson's cerebral white material.  Those results were interpreted as abnormal but "nonspecific"  They could be caused by hypertension or migraines.

On November 16, 1999, Robinson reported to Dr. Baca that she was doing all right although she had had a recent physical illness.  The recent MRI of her head revealed no masses.  She continued on the Paxil.  [Tr. at 171.]  On this same date, Dr. Baca wrote a letter to ISD stating that Robinson could not work for at least 6 months due to her anxiety and depression.  [Tr. at 170.]

On November 30, 1999, Robinson saw Dr. Yamamoto.  [Tr. at 130.]  She complained of a frontal headache and sinus congestion.  She had an appointment with a neurologist for January 2000 relating to trigeminal neuralgia.

On January 5, 2000, Robinson was seen at the University Hospital in Los Lunas for facial pain and prescribed medications for the pain.  [Tr. at 119.]  On January 11, 2000, she was a no show for her appointment with Dr. Baca.  [Tr. at 169.]  On January 21, she reported to Dr. Baca that she was doing well and was physically improved with respect to her facial pain.  She was on Indocin and Neurontin for the pain.  She had missed taking some of her Paxil so she still had a supply of the prescription.  [Tr. at 168.]

A February 23, 2000 record of Dr. Baca's states that Robinson reported she was hospitalized over the weekend related to "sudden suicidal thinking and plan" and multiple stressors.  She was given a prescription for Depakote in the hospital and tolerated it well.  It helped her with moods and facial pain.  She was no longer on the Neurontin and Indocin.  [Tr. at 167.]  Dr. Baca wrote another letter to ISD, stating Robinson was on a new medication and continued to be unable to work for at least another 6 months.  [Tr. at 166, 220.]

A February 22, 2000 medical record indicates that Robinson was hospitalized on February 18, 2000 and discharged on February 21, 2000.  These hospital records are not part of the administrative record.  The hospitalization was related to depression apparently.  By February 22, she felt much better on the Depakote.  She had not been checking her blood sugars and could not remember how to use the glucometer.  She needed samples of diabetes medicines as she could not afford to buy them.  [Tr. at 129.]

On March 7, 2000, Robinson canceled her appointment with Dr. Baca.  [Tr. at 164.]  However, she saw him on March 14 and reported she was doing well.  She had no specific problems with the prescription she was taking.  Her Paxil was being re-filled, although it was not clear she was

taking it. [Tr. at 163.] There is a March 23 therapy record that indicates Robinson was feeling much better and "journaling about her abuse" [Tr. at 162.]

On March 27, 2000, Robinson applied for SSI benefits, alleging an onset date of June 1, 1998. [Tr. at 226.]

On May 18, 2000, Robinson complained of sneezing and nasal congestion. [Tr. at 127.] On May 22, 2000, Robinson visited UH in relation to a front tooth that had broken. She denied any problems other than tooth discomfort. [Tr. at 124.] On June 30, 2000, she was seen at First Choice Community Health Center for dental pain. She apparently could not afford dental treatment but had a dental infection. [Tr. at 126.]

On July 12, 2000, Dr. Scott Walker, a disability consultant, filled out a Psychiatric Review Technique form for Robinson. Dr. Walker noted that Robinson had good cognitive verbal skills. He had reviewed some prior psychiatric notes showing a diagnosis of Bipolar Disorder II and some depression. The notes indicated Robinson had tried to stop her medications but did better with them and was doing well with Paxil. Since beginning Depakote, Robinson was less depressed and having fewer bouts of mania. Dr. Walker noted that the claimant appeared to be stable in treatment with a good response. [Tr. at 151.] Dr. Walker found the presence of an affective disorder but no limitations. More specifically he found slight restrictions as to activities of daily living and difficulties in maintaining social functioning, that Robinson seldom had deficiencies in concentration, persistence or pace and that there was insufficient evidence of episodes of deterioration or decompensation to assess the degree of any limitation. [Tr. at 158.]

On July 17, 2000, Robinson reported to Dr. Baca that she was doing all right on the prescriptions, especially Depakote. The record indicates she might be getting Medicaid and SSI. She

continued to take Paxil according to the record.  [Tr. at 161.]  Robinson's request for reconsideration of the underlying denial of her SSI benefits request was denied on September 21, 2000.  [Tr. at 207, 235.]

On October 3, 2000, Robinson was hospitalized for a week at Presbyterian Kaseman after coming to the emergency room reporting she was trying to kill herself with a knife.  [Tr. at 213.]  She was diagnosed with Bipolar Disorder, PTSD, self defeating behavior, and Diabetes.  She had a GAF of 30 upon admission and 55 upon discharge.  [Tr. at 213.]  She had been off her medications for two to three months and was increasingly depressed.  [Tr. at 213, 216.]  She had no psychotic symptoms and was admitted for stabilization.  The record indicates that Robinson did not follow her diet.  Her diabetes was not well controlled and she had not been taking her medications, although she said the diabetes was not well controlled even if she did take the medications.  [Tr. at 217.]  She smoked about a pack of cigarettes per day.  [Tr. at 216.]  She was sexually active and had multiple partners. [Tr. at 216.]

At the hospital, she was started on Paxil and Depakote.  She  contracted mild pneumonia while hospitalized and was treated accordingly.  Robinson was appropriate in affect and mood when she was discharged.  [Tr. at 214.]

On March 5, 2001, Dr. Baca saw Robinson.  She told him she had missed a previous appointment due to illness and had never re-scheduled.  She had been off her prescriptions for two months and had increased symptoms.  She was prescribed Depakote and Paxil again.  [Tr. at 224.]  On March 5, 2001, Dr. Baca wrote to ISD, stating that Robinson remained unable to work and that he expected her disability to continue "long term, over 1 year.  Prognosis is poor for significant improvement."  [Tr. at 219.]

-13-

On April 18, 2001, Dr. Baca wrote to Robinson's attorney and stated that Robinson's level of symptoms did not meet a Listing level for affective disorders and that her symptom level of severity did not prevent her from working.  However, he stated that Robinson remained at risk for repeat hospitalization for periodic severe increase in manic symptoms.  [Tr. at 218.]  Dr. Baca also filled out a Statement of Ability to Do Work-Related Mental Activities, dated 4/18/01.  [Tr. at 221.]  He concluded that Robinson was limited in understanding and memory and that the limitations were severe enough to preclude any employment.  She also was limited in sustained concentration and persistence, social interaction, and adaptation, which all were severe limitations that precluded any employment in Dr. Baca's opinion.  [Tr. at 221-22.]

On May 4, 2001, Dr. Baca saw Robinson again.  She was out of the Depakote and had missed her last appointment.  She had received the Paxil.  She was again prescribed Depakote.  [Tr. at 225.]

On May 31, 2001, the administrative hearing was held.  Robinson was represented by counsel. The ALJ noted first that there was a possible issue of *res judicata* in light of an unfavorable decision issued the prior year by ALJ Johnson with respect to another application for benefits by Robinson. [Tr. at 246-47.]  This matter was not discussed further.

Robinson testified that she left her last position at the UNM Valencia Campus Library where she catalogued books because she no longer could control her emotions and she elected to leave the job rather than be fired.  [Tr. at 248.]  With respect to her living situation, she could cook meals and shop for herself "most of the time" except when she could not leave her house due to fear.

Robinson also testified that she was being treated for Type II Diabetes and Bipolar Disorder, that she generally weighed 230-235 pounds, although she weighed 226 pounds at the time of the hearing.  [Tr. at 249.]  The Diabetes-related symptoms were fatigue and vision problems.  Her

-14-

medical problems curtailed her ability to do cross-stitching and go dancing or go out at all.  She was unable to drive due to her inability to concentrate.  [Tr. at 250.]  She was sleeping 12-14 hours a day and was easily distracted and fearful.  She had been hospitalized twice for suicidal ideation, the last time occurring in October 2000.  [Tr. at 251.]  During the manic phase of her Bipolar Disorder, Robinson's symptoms included hypersexuality and engaging in dangerous behaviors, like driving too fast, feeling she did not need to take her medication, shoplifting and getting drunk.  [Tr. at 252.]

Regarding her physical problems, Robinson testified that she could not sit for more than 30 minutes at a time or stand for more than 15 minutes.  [Tr. at 252-53.]  She was able to walk three city blocks but could not lift much.  Her average day consisted of fixing herself breakfast, washing dishes and watching TV.  She engaged in no social activities and had a few acquaintances.  [Tr. at 253-54.]  She was taking her medications, which included Depakote, Paxil and her Diabetes medications.  They made her sleepy.  [Tr. at 254.]

Her last position at the library was a part-time job.  [Tr. at 254.]  She also had had a part-time work study position doing clerical work at the Dean of Instruction.  [Tr. at 254.]  She had a part-time job doing other clerical type work at the UNM Valencia Campus academic office.  She had some problems with these jobs with respect to her ability to concentrate and interact with others.  She was not reprimanded at any of these jobs.  [Tr. at 255.]  Prior to these part-time jobs, Robinson worked for about ten years at an answering service.  She had little contact with people on that job.  [Tr. at 256.]  She testified she could no longer do the answering service work because she did not have enough patience with people.  Robinson had not tried to do any other work after June 1998 because she was afraid to try to deal with other people.  [Tr. at 257.]

Judge Vanderhoof asked Robinson about a number of medical records indicating her decision to stop taking her medications as prescribed.  Robinson explained that she made those decisions during the manic phase of her Bipolar Disorder when she felt "ten feet tall and bulletproof."  [Tr. at 258.]  She admitted to being better off while taking the medications but when in her manic phase, she did not feel the medications were necessary.  [Tr. at 259.]  She also agreed that the medications for Diabetes helped control that condition.  [Tr. at 259.]

The ALJ then asked a vocational expert to testify and presented several different hypotheticals to him.  [Tr. at 261.]  If Robinson had no real physical limitations, the VE testified that she could return to work that minimized contact with the general public.  [Tr. at 262.]  The VE testified that all types of work would be precluded if Robinson had limitations understanding and remembering detailed instructions, maintaining regular attendance, getting along with coworkers, and maintaining socially appropriate behaviors.  [Tr. at 264.]  Robinson's attorney asked no questions of the VE.

On June 29, 2001, ALJ Vanderhoof issued his opinion, denying Robinson's request for benefits.  The ALJ concluded that Robinson's impairments did not meet listing level severity with respect to 12.04.  While Robinson's treating physician had concluded that Robinson's limitations were so severe as to preclude any type of work, Judge Vanderhoof found that the physician's opinions were "vague and conclusive."  [Tr. at 19.]  "He did not identify specific vegetative symptoms and he did not indicate the relative severity of each limitation . . . ."

In addition, the ALJ concluded that Robinson's reported symptoms and restrictions lacked credibility and were not supported by the evidence overall.  Judge Vanderhoof was particularly swayed by Robinson's failure to comply with medications when it appeared that she did fairly well

while taking her medications.  In addition, he did not find evidence to support the level of exertional restrictions about which Robinson testified.

Judge Vanderhoof determined that Robinson retained a RFC that supported unskilled, routine work activities at all levels of exertion, provided they did not require working with the public or significant contacts with coworkers.  He also found that nonexertional factors did not significantly erode this work capacity.  The ALJ again considered Dr. Baca's opinions about Robinson's ability to work.  Judge Vanderhoof concluded that based on the medical evidence Robinson did well and was stable when taking her medications, but that her conditions deteriorated when she went off the medicines.  Dr. Baca provided no reason other than her failure to comply with medications as to why she was unable to work.  Thus, the ALJ decided that Dr. Baca's opinion did not establish that Robinson was disabled for purposes of her application for benefits.  [Tr. at 20.]

Robinson requested review of the ALJ's decision.  On August 9, 2001, Robinson's attorney submitted one additional medical record for the Appeals Council to consider – a statement of Robinson's ability to do work related physical activities by treating physician Dr. Yamamoto, dated July 12, 2001.  [Tr. at 241.]  Dr. Yamamoto restricted Robinson to occasional lifting or carrying of less than 10 pounds, frequent lifting or carrying of less than 10 pounds, standing or walking of less than 2 hours, periodically alternating sitting and standing to relieve pain, and limited ability to push and pull.  [Tr. at 242.] Dr. Yamamoto wrote that the "medical findings" supporting this opinion were based on Robinson's reported symptoms.  [Tr. at 242.]

### Discussion

In this appeal, Robinson asserts that the ALJ's decision should be reversed because:  (1) the ALJ failed to give controlling weight to the treating psychiatrist's opinion; (2) the ALJ failed to apply

the correct legal standard in finding that she was non-compliant with her medications; (3) the ALJ failed to apply the proper legal standard in determining that Robinson could perform her past relevant work; and (4) the ALJ omitted and ignored VE testimony that Robinson could not perform any work due to her mental restrictions.  The Commissioner claims that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations.

## I.   <u>TREATING PSYCHIATRIST'S OPINION</u>

"An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record" or unless there is good cause to disregard it.  <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001) (*citing* 20 C.F.R. § 416.927(d)(2)); <u>Goatcher v. United States Dep't of HHS</u>, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion may be rejected if it is "brief, conclusory, and unsupported by medical evidence."  <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987).  In addition, a treating physician's opinion is not dispositive as to the ultimate issue of disability.  <u>Castellano v. Sec'y of HHS</u>, 26 F.3d 1027, 1029 (10th Cir. 1994).  This is true because the determination of ultimate issues like that of one's disability is the responsibility of the Commissioner.  <u>Id.</u>  When a treating physician provides opinions or determinations that are reserved to the Commissioner, those assessments are not given controlling weight or any special significance over other medical evidence.  <u>Id.</u>

However, when a treating physician provides an opinion on the ultimate issue of the claimant's disability, the ALJ still must consider that opinion.  If the ALJ disregards the treating physician's opinion, the ALJ must set forth legitimate and specific reasons for doing so.  <u>Drapeau</u>, 255 F.3d at 1213; <u>Goatcher</u>, 52 F.3d at 289-90.  Specifically, the ALJ must consider the following factors to determine what weight to assign to a treating physician's opinion:  (1) length of the

-18-

treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area in which the opinion is provided; and (6) other factors brought to the ALJ's attention that tend to support of contradict the opinion.  Goatcher, 52 F.3d at 289-90.  *See also* Nelson v. Commissioner, __ F. Supp. 2d __, 2003 WL 1554165 (D. Kan Mar. 7, 2003) (analyzing ALJ's rejection of a treating psychiatrist's opinion and reversing).

Here, Robinson's treating psychiatrist, Dr. Baca, treated her from April 1998 through May 4, 2001.  Dr. Baca's medical records are brief and relate primarily to the management of Robinson's medications.  Robinson was also attending therapy during this same time period, although those records are not part of the administrative record.  Robinson saw Dr. Baca, sometimes more than once a month, in April, May, June, July, August, September, October, November, December of 1998.  In 1999, Robinson saw Dr. Baca in March, April, May, September and November.  She was a no-show for several appointments with Dr. Baca in 1999.  In 2000, Robinson saw Dr. Baca in February, March and July.  In 2001, she saw Dr. Baca in March and May.  Clearly, Dr. Baca is a specialist in the pertinent area of psychiatry.  While the ALJ made no specific findings as to the frequency of the treating relationship between Dr. Baca and Robinson, the nature of that treatment (i.e., medical management), or the fact that Dr. Baca was a specialist, the ALJ reviewed and referred to the medical records that document all of these factors.  [*See* Tr. at 20.]

There are approximately 40 pages of medical records related to Robinson's psychiatric treatment by Dr. Baca. [Tr. at 160-206.] Many of the records consist of little more than two or three type written lines showing Robinson's diagnoses, current medications and how the dosages were

affecting her. The records usually note that the appointments lasted 15 minutes. Dr. Baca recommended therapy on occasion, and he increased her anti-depressant medication several times. Based on these brief entries, it appears that Robinson was improving and doing all right on the medications although she sometimes reported stress and irritability related to family matters.

At one point in late 1999, Robinson decided to stop her medications, after which she reported she was not doing well. Dr. Baca resumed her medications, and she seemed to improve. In early 2000, Robinson reported that she had missed taking some of her anti-depressant and shortly thereafter, she was hospitalized over a weekend related to suicidal thinking. In the hospital, she was prescribed different medications for her depression and Bipolar Disorder and seemed to improve on them. In October 2000, she was again hospitalized related to suicidal ideation. She was not taking her medications and had become increasingly depressed. Once she started taking the medications again, she improved. In March 2001, she had stopped taking the prescriptions again and felt worse. She started taking her medications and apparently improved.

During his treatment of Robinson from 1998-2001, Dr. Baca wrote about six letters to the ISD on behalf of Robinson. Most of the letters indicate her diagnoses, her medications and Dr. Baca's opinion that Robinson would remain disabled and/or unable to work for 3 months, 6 months or one year.

Robinson argues that the ALJ failed to give controlling weight to Dr. Baca's opnion that she was disabled and unable to work. [Doc. 9, p. 10.] However, as indicated above, the ALJ need not give controlling weight to a treating physician's opinion on the ultimate determination of disability which is reserved to the Commissioner.

Moreover, it is clear that Judge Vanderhoof properly considered and weighed Dr. Baca's opinions. He observed that Dr. Baca had offered opinions that Robinson was unable to work due to the severity of her symptoms [tr. at 20], but discounted those opinions based on Dr. Baca's notations that Robinson improved when on her medications and had significant problems only when she elected to take herself off the medications. Thus, the Court finds that there is substantial evidence supporting the ALJ's decision to disregard or discount Dr. Baca's opinion as to the ultimate issue of disability.

This is particularly true under the circumstances of this case where there is no indication by Dr. Baca that Robinson's decisions to discontinue her medications on more than one occasion were due to periods of mania. Indeed, none of the actual medical records reflect a finding by Dr. Baca that Robinson exhibited mania on any occasion. Moreover, the records of Dr. Baca are brief and conclusory and do not provide objective medical evidence to support the opinions provided by Dr. Baca to the ISD that Robinson was disabled and unable to work.

Furthermore, some of Dr. Baca's records near the dates he wrote to the ISD indicate that Robinson was doing well or was improved, rather than appearing to be unable to work. For example in late April 1999, Robinson reported she was doing well and planning to move to Colorado. [Tr. at 176.] Three weeks later, Dr. Baca wrote the ISD stating Robinson was unable to work for at least another 3 months due to her major mental illness. [Tr. at 175.] A week after this letter was sent, Robinson reported she was doing well overall. [Tr. at 174.] Similarly, on November 16, 1999, Robinson told Dr. Baca that she doing all right on the medications, and yet, on the same day, Dr. Baca wrote to the ISD stating that Robinson could not work for at least another 6 months. [Tr. at 170, 171.] The medical records, therefore, do little to provide objective medical support for the opinions Dr. Baca supplied to the ISD.

On March 5, 2001, Robinson saw Dr. Baca after not seeing him for several months. The record reflects that she had missed a prior appointment and not re-scheduled. She was off her medications then for about 2 months and was having increased symptoms. Dr. Baca recommended she schedule an appointment with a therapist and follow up with Dr. Baca in 7 weeks or as needed. [Tr. at 224.] Nothing in the record explains why she had stopped her medication, nor does Dr. Baca describe any of Robinson's symptoms. The next record, dated May 4, 2001, is equally unrevealing. Dr. Baca states simply that Robinson is out of her prescription for Depakote and that Robinson may have missed another prior appointment. The record notes nothing about Robinson's symptoms or how she was doing. Even though these records provide little information about Robinson's mental condition, Dr. Baca filled out a form document, Statement of Ability to Do Work-Related Mental Activities, during this same time period, concluding that her mental limitations precluded all types of employment. [Tr. at 221-22.] It simply is not clear what objective medical evidence Dr. Baca drew from in reaching his conclusions. Moreover, evaluation forms consisting of checked off boxes, unaccompanied by thorough written reports or persuasive testimony are not entitled to significant weight. *See* Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987) (finding that such forms alone do not constitute substantial evidence to support an ALJ's decision).

For all the reasons explained above, the Court concludes that substantial evidence supports the consideration of and weight assigned to Dr. Baca's opinions by the ALJ. Thus, the ALJ did not commit error in his consideration of Dr. Baca's opinions.

## II.   COMPLIANCY IN TAKING MEDICATIONS

A claimant may be found to be disabled under the 5-step analysis and yet be denied benefits if she does not follow prescribed treatment that will restore her ability to work. 20 C.F.R. §

404.1530(a).   The Tenth Circuit has established a test that must be followed in making a determination as to compliance or non-compliance in taking prescribed medications.  A claimant's failure to comply with treatment will preclude a recovery of disability benefits if the following four elements are supported by substantial evidence: (1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must be prescribed; (3) the treatment must have been refused; and (4) the refusal must have been without justifiable excuse.  Teter v. Heckler, 775 F.2d 1104, 1107 (10thb Cir. 1985).  The SSA developed a similar standard set out in Social Security Ruling ("SSR") 82-59.  A claimant's failure to comply with prescribed treatment will not always bar her from receiving disability benefits if she has a justifiable excuse for refusing treatment.  20 C.F.R. § 414.1530(c).

Here, the ALJ referred to Robinson's non-compliance with respect to his credibility findings [tr. at 19] and his later findings that Robinson was not disabled [tr. at 20.]  However, it makes little difference since the law in this circuit appears to require that the above described 4-step test be applied whether the ALJ is discussing non-compliance as a basis for credibility findings or a determination of non-disability.  See Goodwin v. Barnhart, 195 F. Supp. 2d 1293 (D. Kan. 2002).

The ALJ noted that Robinson's medical records indicated her symptoms relating to depression and/or Bipolar Disorder improved when she took the prescribed medications and that her symptoms worsened when she elected to stop her medications.  [Tr. at 193, 192, 191, 188, 187, 186, 178, 174, 133, 172, 171, 167, 129, 163, 161, 217, 214, 224, 225.]  The scenario involving Robinson's decision to stop her medication, with the result that her symptoms worsened and then improved after resuming the medications, happened more than once.  Indeed, the record evidence demonstrates that the prescribed treatment was effective and that without medication, Robinson did not do well.

Thus, there is substantial evidence in the administrative record to support the ALJ's findings that Robinson "does well and continues in stable condition" provided she complies with her psychotropic medications.  [Tr. at 20.]  The ALJ made this finding in reference to his discussion of her ability to work, which satisfies the first element of the 4-part test.  Moreover, Robinson does not challenge the fact that the medications are effective when she takes them.

It is undisputed that Robinson was prescribed medications for her mental condition, and that she periodically elected to stop the medicines by her own decision.  Indeed, out of the numerous references in the medical records that Robinson was not taking her medications, there are few references to requests for samples of diabetes medication or indications that she could not afford to buy them.  [*See, e.g.,* Tr. at 129.] Robinson's attorney argues that Robinson's decision to stop her medicines is not the same as a "refusal" to take those medicines because her medical condition or the manic phase of the Bipolar Disorder led her to believe she did not need to take the medicines. Although Robinson did testify at the hearing that she felt invincible during the manic phase of her bipolar condition, none of the objective medical evidence supports her testimony that she stopped medications only when she was manic. Indeed, the medical records show repeated decisions on her part to stop her medications for both diabetes and her mental conditions and to re-start the medications when she felt worse, as well as consistent decisions to disregard physicians' instructions to monitor her blood sugar and her diet.  The record also reveals many instances when Robinson missed her appointments with Dr. Baca, apparently without even canceling the appointments.  The record does not support any claim that Robinson's indigency precluded her from taking her medications.

The Court concludes that the record as a whole contains substantial evidence to support the ALJ's findings that Robinson was non-complaint with medications that could restore her ability to work and that Robinson failed to provide any acceptable reasons for failing to follow the prescribed treatment.[10] Thus, the ALJ did not commit any error in determining that Robinson was non-complaint and not entitled to benefits.

## III.   STEP FOUR FINDING THAT ROBINSON COULD RETURN TO HER PAST RELEVANT WORK

Step 4 of the sequential analysis consists of 3 phases.  First, the ALJ must evaluate a claimant's physical and mental RFC.  Typically, RFC is defined as that which an individual is still able to do despite the limitations cause by her impairments.  Second, the ALJ must determine the physical and mental demands of the claimant's past relevant work.  Third, the ALJ finds whether the claimant has the ability to meet the job demands found in phase 2 despite the limitations found in phase 1. Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996); SSR 82-62.  The burden of proving disability remains with the claimant at step 4, but the ALJ has a duty of inquiry and factual development.  Henrie v. U.S. Dep't of HHS, 13 F.3d 359, 361 (10th Cir. 1993).

Robinson argues that the ALJ made a number of errors at step 4 of the sequential evaluation, including his emphasis on the fact that Robinson was non-compliant with medications and his conclusion that nonexertional restrictions did not severely impact Robinson's ability to perform her past relevant work.  Robinson also contends that the ALJ did not satisfy the steps laid out by the

---

[10]A claimant's inability to afford treatment or religious beliefs may sometimes constitute acceptable justification for failing to adhere to prescribed treatment.  Lopez-Navarro v. Barnhart, 207 F.Supp. 2d 870, 883-84 (E.D. Wi 2002).  Here, while Robinson stated she could not afford some of her medications, she frequently was provided samples of medications or Dr. Baca applied for and received assistance for payment of  Robinson's medications.  Moreover, when asked at the hearing why she discontinued her medications at times, Robinson did not contend that she was unable to afford or obtain the medications.

Tenth Circuit in <u>Winfrey</u>, particularly with respect to her alleged mental limitations.  The Court disagrees and finds that substantial evidence supports the ALJ's step 4 findings.

As to the first phase of the step 4 analysis, Judge Vanderhoof concluded that Robinson retained the RFC to perform unskilled, routine work activities at all levels of exertion, provided she is not working with the public or having significant contacts with coworkers.  The ALJ also determined that nonexertional factors had not significantly eroded this work capacity.  [Tr. at 20.] Based on his thorough review of the medical records, the ALJ reasoned that Robinson's mental condition was stable and that she did well when compliant with her medications.

The Court will not re-weigh the evidence but notes that there essentially is no objective medical evidence that is substantiated to support an argument that Robinson was physically unable to perform unskilled routine work activities.  Moreover, the medical records, as discussed above, provide substantial support for the ALJ's conclusion that Robinson had the mental RFC to perform her prior relevant work as long as she was compliant with her prescribed treatment and was not required to work with the public or have significant contacts with co-workers.

During the second phase of step 4, the ALJ must determine the physical and mental demands of Robinson's prior relevant work, and then at the final phase, determine whether Robinson could meet those demands in light of her impairments and RFC.  At the hearing, the ALJ asked Robinson about her prior work.  She claimed to have some problems with distraction and not getting organized, yet she admitted that she was never reprimanded at any of the pertinent clerical jobs.  [Tr. at 255.] She described her job duties as making photocopies, answering the phone and taking messages.  [Id.] She also checked books in and out at the library.  [Tr. at 256.]  The ALJ also examined the Disability Report filled out by Robinson and asked her about her education.  [Tr. at 257.]  Robinson explained

that she had completed three years of college and had obtained grades of A's and B's in a drafting program. [Tr. at 258.]

Robinson testified that her main problem in her past relevant jobs involved interactions with other people and her difficulties in controlling emotional outbursts, although again she conceded that she never received a reprimand at work regarding any such conduct, nor did anyone counsel her about inappropriate conduct. [Tr. at 255-56.]

The ALJ considered this testimony by Robinson, particularly her contention that she had difficulties in the past dealing with people at work. [Tr. at 20.] Robinson also testified that she was accommodated at some of her clerical jobs by being assigned work that did not require a great deal of interaction with people. [Tr. at 256.] Judge Vanderhoof accorded Robinson the benefit of the doubt by finding that even when she was compliant with her medications, she could be expected to experience difficulties with her attention and concentration and social interactions on the job. Thus, he concluded that she required a work environment that did not involve significant social interactions and that consisted of simple routine work. [Tr. at 20-21.]

At step 4, the ALJ is not required to seek the testimony of a vocational expert. However, the pertinent social security rulings allow an ALJ to obtain information from the VE regarding the demands of a claimant's past occupations. S.S.R. 82-61 and 82-62. If the hypothetical question posed to the VE includes all of the ALJ's findings regarding a claimant's RFC, the VE's response may constitute substantial evidence in support of the ALJ's step-4 determination. Townsend v. Chater, 91 F.3d 160 at *3 (Table, Text in Westlaw), 1996 WL 366207 (10th Cir. July 1, 1996).

Here, Judge Vanderhoof presented to the VE information regarding Robinson's education, her lack of physical limitations, her moderate limitation in interacting with people, and the

-27-

requirement that her work have a low to moderate pace.  The VE responded that she could perform her past relevant work provided the job involved minimal public contact.  [Tr. at 262.]  The ALJ added limitations to the hypothetical, i.e., work with only a few coworkers and routine, repetitive work.  The VE continued to conclude that she could do the past relevant work, as stated.  [Tr. at 263.]

Robinson also asserts that the ALJ omitted or ignored VE testimony that she was unable to perform any work due to her mental restrictions.  At the hearing, Judge Vanderhoof asked a last hypothetical of the VE including limitations that the individual would not respect location and work-like procedures, would not understand or remember detailed instructions, would have problems maintaining attention and concentration for extended time periods, would be unable to maintain regular attendance and punctuality requirements within what is customarily tolerated in a work setting, would be unable to complete a normal workday or workweek without interruptions from psychologically based symptoms, would be unable to get along with peers without distracting them or exhibiting behavioral extremes, and would be unaware of the normal hazards.  [Tr. at 263-64.] Naturally, the VE testified that all work, under that set of limitations, would be precluded.  [Tr. at 264.]  However, to the extent that these limitations were extracted from Dr. Baca's cursory medical reports or letters, or his checked-off boxes on a form document, they simply do not correlate with the objective medical evidence and testimony in the record.  In other words, this is not a situation where the last hypothetical was based on substantial evidence and then ignored by the VE.  Thus, the VE was not obligated to consider this hypothetical or the response to it in reaching his decision.

Based on the ALJ's findings and discussion of evidence, Robinson's testimony at the hearing and the VE's responses to the questions posed, the Court concludes that there was substantial evidence to support the ALJ's step 4 findings and that no error was committed.

IT IS THEREFORE ORDERED that Robinson's motion to reverse or remand [doc. 8] be denied, and that this matter be dismissed, with prejudice.


_____
Lorenzo F. Garcia
Chief United States Magistrate Judge